Good morning. May it please the court. Meredith Vaughn on behalf of Appellant and Defendant Robert Turchin. This is a case where the United States has gone way overboard in making a big federal crime out of an offense to the state that is not a federal matter at all. It's not federal business and it would not qualify under mail fraud and so the United States got creative and decided to charge a low-level division of motor vehicle employee with conspiracy and identity theft. As the jury found it, for helping a truck school owner to pass some unqualified candidates who were applying for commercial driver licenses. Now the wrongful conduct of which Mr. Turchin was convicted has nothing to do with identity fraud. It does not involve anyone purporting to be or to make somebody else somebody who they're not. The identification function to a driver's license is of course key, but in terms of Mr. Turchin participation in that process, it's a peripheral, it's incidental. And for that reason, to charge Mr. Turchin under section 1028 was unprecedented in this circuit and way overbroad. Now a lot of other people were charged too. But now isn't it an identification document produced without lawful authority? I mean, so it doesn't have to be classic identity theft. It's an identification document and it was produced and issued without lawful authority. Doesn't that fit the language? Only if you construe the language in an impermissibly broad way, Your Honor, the rule of lenity applies for any kind of doubt or vagueness in construing a criminal statute. And here, Mr. Turchin's role was strictly in the testing process for licensing. His participation in issuance of identification, at least for purpose of identification, was incidental and thus outside the scope of section 1028. Does that not turn on how you construe the meaning of the word produces? Did you hear me? Well, yes, I did, Your Honor. It may, it may, but to the extent that that word produces is unclear what it's referring to. Production of what? Well, production of an identification document. So my question, so this does seem like pretty heavy handed. However, the activities do seem to fall within the literal language. So I'm just curious about, you know, what, how, well, how would you describe his role in the production of an identification document? Incidental, peripheral, to the extent that his role had any part in the identification function of that document. And he was, he was fulfilling its purpose. He was not issuing a license or a passing grade for a license to anybody who was purporting to be somebody other than themselves. Except, of course, unbeknownst to Mr. Turchin, some of these applicants were planted government operatives. So in that sense, they were not authentic. But, okay, so from Mr. Turchin's point of view, his role had nothing to do with identification, especially in the sense of, well, the wrongful conduct that he was convicted of had nothing to do with identification. And there was nothing improper about the identification function in terms of this process, identifying the individuals who it purports to identify. There was no impropriety with respect to the identification of individual persons function. Well, issuing the license, though, is the license is that the commercial driver's license here is a representation that this person has qualified for this license. And to that extent, it is fraudulent. And it enables someone to use that license to transport trucks on our nation's highways. And that person is held out to be qualified to do that. And when in fact they're not, or they haven't qualified. Well, Your Honor, that is one potential way to read the statute. But it is a broad reading of a broad construction of the statute, which is not permissible, particularly absent any precedent in this circuit to so construe it that way. The statute itself in a different subsection defines what its identification purpose is about. Even assuming that someone in Mr. Turchin's position had been studying Section 1028 and asking himself, am I in violation of this statute? It would not be clear because, for one thing, there's no precedent that makes it clear. And this case should not be the precedent to establish that because it entails an overly broad construction of the statute. When the rule of lenity applies, over-criminalization is not proper in statutory construction. There is another issue. Well, there are a few issues. Another issue as well is Your Honor mentioned this being overblown. And one area where this case was extremely overblown was in the valuation of the conduct. Okay. And valuing the value of the offense at $5,000 for each of 45 instances, that $5,000 figure should be rejected by this court. That is completely contrary to the way this court addressed the valuation issue in United States v. Harper. A case that was cited in Appellant's opening brief. And that case was a conspiracy case. The valuation is improper. And even just on a common sense level, the idea of sending this 70-year-old man to prison who had never committed any offense in his whole life for this when he was probably the least involved in the whole scheme, that's not necessary. Is it really necessary to send this kind of person for this kind of conduct to prison at all? And that's even before the pandemic. But even before the pandemic, even when we didn't know there was going to be a pandemic, Mr. Turchin was among the most vulnerable of our citizens. And he got sent to an incredibly harsh environment that his conduct, even if he is guilty, of all the charges, his conduct did not warrant that kind of punishment. So what should, so I also have a question that $5,000 for each offense, but what was, what do you think each offense should have been valued at? Your Honor, there are various ways of approaching that. Mr. Turchin contends that the appropriate valuation would have been based on what was the going rate for the service, the wrongful conduct that he was convicted of doing. And the evidence viewed in the light most favorable to the government shows that that's about $100 per instance. And if you assume that all 45 instances are appropriate to penalize Mr. Turchin for, which we do not agree with that either, but if you were taking it in that light, then 45 times $100 is $4,500. So what's the basis in the record for $100? I saw some, $5,000 was the maximum and that was paid by a government agent or someone working for the government. But then I saw some at $3,000. So I could see a basis at $3,000, but I didn't see any at $100. Well, $100 is based on what another technician, Emma Clem, was actually reported that she was actually paid by Gil for her part in his Trump school scheme. But it's also worth pointing out, Your Honor, that again, emphasizing that there was no evidence before the jury that Mr. Turchin accepted or received a bribe of any kind. And when asked about that, Clem could identify an uncharged actor, Sylvia Huerta, who she had enlisted and she knew about Gil paying Huerta a similar amount of money for a similar service. But Clem could not say at all that she knew of Turchin getting paid by Gil for this service. There's no evidence even across the record that makes that clear, that Turchin ever was paid for this service by Gil. At most, there is evidence in post-sentencing reports, a plea agreement and allegations concerning Gil, who didn't testify even though he was there, that he helped Mr. Turchin with a credit card once or twice, which is not even a per-incident kind of help. And the maximum under that measure would be $6,500. May I please reserve a minute or so for my rebuttal? Yes, you may, Counsel. Thank you. Okay, Ms. Rust. May it please the Court. My name is Roseanne Rust, and I represent the Alpha Lee, the United States. This Court has been discussing the $5,000 valuation method. And as Judge Wardlaw noted, one of the confidential operatives, Suman G. Carr, had to pay Gil $5,000 in order to obtain her fraudulent commercial license. Now, that's not a clearly erroneous fact found by the Sentencing Court when dealing with the valuation-specific offense characteristic. And based on other facts, the licenses were worth at least $5,000. It does seem like the only evidence of market rate was of rates lower than $5,000, because the only one seems to have been from government agents offering $5,000. Am I reading that incorrectly? There is other evidence in the PSR, Your Honor, that talks about Gil actually telling agents on April 1, 2015, that by that time he was actually charging as high as $6,500 for fraudulently procured licenses. And other paragraphs in the PSR detail what happened with another corrupt truck school that's also a part of the indictment, but separate in different charges. And in those paragraphs, it talks about FBI confidential informants having to pay the price requested there, which was $5,000 for fraudulently procured licenses. This is not to dispute that there was a range, but $5,000 is definitely supported by the facts and the record. And unlike other cases, it's uniquely tied to the expectation of what a fraudulent commercial license holder could expect in return. Gil charged $5,000 for Suman G. Carr's license. And he had noted at the time that he was increasing his rate and that it was tied to this idea that a license holder could expect to earn $5,000 for one month's worth of work. And surely individuals who are going to all this trouble to get those licenses were expecting to use them for longer than a month period. So here, the $5,000 valuation seems to fit well within this type of case, which is unique. It is a multi-year conspiracy with dozens of bribe payments being made to a leader who then in turn uses corrupt DMV employees like Turchin to pass his students on tests they didn't pass so that they can in fact get their commercial driver licenses. Based on this, the record does not support that that would be clearly erroneous or an abuse of the court's discretion when trying to resolve the proper method valuation under 2C.1.1.B.2. Did the government present any direct evidence that Mr. Turchin himself received bribes? At trial, Your Honor? Yes. Your Honor, at trial, the evidence produced was circumstantial evidence, which is sufficient to support a conspiracy charge. Here, Turchin was found with several unmarked envelopes filled with over $10,000 in cash hidden in the trunk of his SUV just days after he had updated several fraudulent CDLs for Gail, had texted in code that they were ready, and the two met for lunch. And so it's definitely a logical inference the jury could find that that money was in fact bribe payments from Gail. And this makes sense. Counsel, was it $10,000 in total or did each envelope have $10,000? Your Honor, the testimony elicited from Agent Fragay was that the total was somewhere between $10,000 and $15,000. He could not recall the exact amount at the time. So each of the envelopes, Your Honor, contained less than $10,000. I believe he discussed on cross-examination with defense counsel that there were various denominations of money, tens, twenties, hundreds, but he could not recall exact. Did he testify to how many envelopes there were? Four to five envelopes, Your Honor.  And, Your Honor, at the time of sentencing, when we're talking about the other challenge-specific offense characteristic, Gail had stated that he had paid Turchin as well as Clem for his fraudulent updates to necessary test scores that his students needed in order to obtain their licenses. And at the time the court was considering this, Gail had already pleaded guilty to count two, which was in the PSR and known to the judge at the time. In all the PSRs in the Eastern District, when we're talking about conspiracies, the status of other individuals is known to the judge as well. Now, turning to Ms. Fahn's argument with respect to 1028A1 and the substantive charges, the indictment properly alleged that Turchin had knowingly produced an identification document without lawful authority. The statute defines both identification documents and false identification documents differently. Her argument turns exclusively on this idea about false identification documents. But the government has never shied away from the fact that the individuals who are applying for these licenses were who they said they were. In fact, they were trying to get what would be perceived as real licenses out in the public to anyone else who was viewing them. And in an unpublished decision in 2017, another panel of this court did find that identification documents under 1028D3 include licenses. And, of course, that was expanded upon in the 11th Circuit's decisions in United States v. Mendez and Venegas. And here, that would make sense. Based on the plain language, identification document would cover a driver's license. I guess I might go back to my question I asked of Ms. Fahn. Did he produce them? I mean, how are you construing the word produce? Your Honor, as Antonia Selov testified, as did others from the DMV, there were several requisite steps that needed to be taken to produce the document itself. There were several qualifications that had to be satisfied, and those were a series of tests. And as soon as those tests were satisfied, Deanna White had testified that the computers would talk to each other. And so once the final test had been updated fraudulently, there would be a message that was sent from the computer at the terminal and the Salinas DMV up to the one here in Sacramento. And it would say, this person has satisfied the requirements. Their license is ready to produce. Produce it and send it out in the mail. And so his steps were required in order to cause the production of the licenses. If there are no further questions, Your Honor, the United States respectfully requests that this court should uphold Turchin's guilty verdicts and affirm the law and guideline sentence he received after trial. The sentence was within the sentencing court's discretion and based on the facts in front of the court at that time. Thank you. Thank you, counsel. Ms. Fahn, you have a couple of minutes. Thank you. Excuse me. As Ms. Rust said early in her argument, this case is unique. And that's a reason why statutory construction needs to be applied under the rule of lenity. The scheme at issue of which Mr. Turchin's conduct was the tiniest part of, yes, it was material, but it was the tiniest part of anybody involved, did not go to the identification function at all. Also, the acts he was convicted of did not span years. They spanned months. That's another typical example of the government overblowing what happens here. Just as they jacked up the valuation in order to force a prison sentence, that alone should have required proof by clear and convincing evidence. And the valuation method that's appropriate is a matter of law. It's subject to de novo review. Thank you, your honors. Thank you, counsel. The United States v. Turchin will be submitted, and we will take up Bayer v. the California Department of Transportation.
judges: Fernandez, Wardlaw, Collins